# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL ACTION NO. 3:15-CV-00316-RJC-DSC

| | |
|---|---|
| REMI LABA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| STEPHEN KEITH COPELAND ) | |
| KERR PUTNEY ) | |
| CITY OF CHARLOTTE, ) | |
| ) | |
| ) | |
| Defendants. ) | |
| ) | |

**THIS MATTER** comes before the Court on the following: (1) Plaintiff Remi Laba's ("Laba" or "Plaintiff") Motion for Summary Judgment, Supporting Memorandum, and Exhibits (Doc. Nos. 27 and 28 to 28-5); (2) Defendant Officer Stephen Copeland's ("Defendant Copeland") Motion for Summary Judgment, Supporting Memorandum, and Exhibits (Doc. Nos. 29, 30, and 31); (3) Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgement and Exhibits (Doc. Nos. 35 to 35-1); and (4) Defendant's Response in Opposition to Plaintiff's Motion for Summary Judgment (Doc. No. 36). The motions have been fully briefed and the issues are ripe for adjudication. For the reasons set forth below, because Defendant Copeland had probable cause to arrest Plaintiff, and because he is entitled to qualified immunity, Defendant Copeland's Motion for Summary Judgment, (Doc. No. 29), is granted, and Plaintiff's Motion for Summary Judgment, (Doc. No. 27), is denied.

I.  **BACKGROUND**

Airport travel has changed. Transportation Security Administration ("TSA") security checks have become a way of life. Travelers are now told to get to airports not one hour before

their flights but rather two hours to leave enough time to clear security. Law enforcement worries about bombs, knives, box-cutters, and—we learn from this suit—truffle pâté. On August 9, 2012, Plaintiff, accompanied by his then-girlfriend, was arrested at the Charlotte-Douglas International Airport in Charlotte, NC for disorderly conduct at an airport under N.C. Gen. Stat. § 14-275.1 and resisting an officer under N.C. Gen. Stat. § 14-223. The parties have submitted their factual narratives and exhibits, including copies of TSA video footage that visually captured the incident from four different angles,[1] but which did not capture any audio (the "TSA Video") (Doc. No. 31, Exhibit 5). Based on those submissions, the Court finds the following facts to be agreed to by the parties, undisputed, or established by the record.[2]

Plaintiff, who was traveling to St. Barthelemy—a Caribbean island on which he owns a restaurant—carried with him jars of truffle pâté to be used in his restaurant. (Doc. No. 30 at 3–4). At the security checkpoint at Charlotte-Douglas Airport, Plaintiff was pulled aside by a TSA employee after a scan of his bag detected the jars of pâté. (Id. at 4). It is neither clear nor relevant whether the jars of truffle pâté constitute a solid or a liquid or a gel for TSA travel purposes, but this was the debate that ensued. Plaintiff, after having cleared airport security with the pâté in New York believed that it was a solid and he could travel with it in his carry-on luggage. (Id.). The TSA employees that Plaintiff spoke with believed that the pâté was either a liquid or a gel and was subject to volume restrictions which the jars far exceeded. (Id.)

---

[1] The flash drive provided to the Court as Exhibit 5 to Defendant Copeland's Motion for Summary Judgment contained, among other things, a folder labeled "Single Camera Views," each of which documents the events at hand from a different view. When citing to the TSA Video, the Court will cite the specific camera view being referred to by the Court. In many instances, the camera view cited by the Court is not the only view that captures the relevant material.

[2] The Court notes that Plaintiff's brief in support of his summary judgment motion contains a relatively short two-paragraph description of the events that led to Plaintiff's arrest. (Doc. No. 28 at 2–3). Defendant Copeland's brief in support of his summary judgment motion, on the other hand, contains a much more detailed factual background and in doing so, relies on Plaintiff's complaint, (Doc. No. 1); his deposition, (Doc. No. 28-5 and Doc. No. 31, Exhibit 1); and his then-girlfriend's deposition, (Doc. No. 31, Exhibit 2).

First, Plaintiff spoke with at least two TSA employees regarding the contents of the jars. (Id. at 4–6; TSA Video, PTZB2 B Sterile at 9:00:00–9:06:07 a.m.). Despite Plaintiff's pleas and explanation, he was told he would not be allowed to carry the jars of pâté in his carry-on luggage. (Doc. No. 30 at 4–6). Plaintiff asked to speak with a supervisor and that request was granted. (Doc. No. 28-5 at 61). The TSA supervisor provided Plaintiff with three options: check the bag, leave the jars of pâté behind, or reschedule his flight to a later flight for which he could check his luggage. (Id. at 5; Doc. 28-5 at 61–62). Plaintiff opined that none of those options were reasonable. (Doc. No. 30 at 5; Doc. No. 31 at 112). Plaintiff claims that he could not check the bag and still make his current flight due to time restrictions and because he had already checked into the flight in New York and therefore could not check-in again. (Doc. No. 28-5 at 61–62). Further, missing his flight—the only flight from Charlotte to St. Martin for the day according to Plaintiff—or abandoning his $3,000 worth of truffle pâté were not reasonable options. (Id.).

Throughout the interaction with these TSA agents, which lasted approximately eight minutes, Plaintiff became progressively more animated. (TSA Video, PTZB2 B Sterile at 9:00:00–9:08:00 a.m.). At one point, Plaintiff demonstrably opened one of the jars of pâté, dipped his fingers in it, and then placed his pâté-covered fingers in his mouth apparently to prove the content of the jars. (TSA Video, PTZB2 B Sterile and B15 B3 Bag Search at 9:04:22–9:04:36 a.m.). Plaintiff's growing animation also drew the attention of bystanders, including other TSA employees. (See, e.g., TSA Video, B25 B Overview at 9:04:27–9:05:00 a.m.) By the end of this interaction, the video clearly demonstrates that Plaintiff is no longer calm and is at bare minimum aggravated and frustrated.

After Plaintiff did not receive a satisfactory answer from the TSA supervisor, Plaintiff requested to speak to a higher ranking TSA employee, specifically, the Director of TSA Security.

(Doc. No. 28-5 at 64–65). But, instead of the Director of TSA Security, three police officers arrived on the scene: Defendant Copeland, Tim Ely, and Vicki Williams. (Doc. No. 28-4 at 7). The officers were called to handle a "disruptive passenger." (Doc. Nos. 30 at 7; 31 at 88). Soon thereafter, two TSA managers also appeared and engaged with the collection of personnel dealing with Plaintiff. (TSA Video, PTZB2 B Sterile at 9:10 a.m.). At this point, the TSA Video shows at least six different TSA and law enforcement officials on the scene and responding to Plaintiff's behavior. Speaking to Officer Ely, Plaintiff again told his story and explained why he believed he should be allowed to travel with the jars of truffle pâté in his carry-on luggage. (TSA Video, PTZB2 B Sterile at 9:08:31; Doc. No. 28-5 at 69). And again, Plaintiff was told that he would not be permitted to proceed past security with the pâté. (Doc. No. 28-5 at 69). After additional discussion, Plaintiff eventually decided to leave the pâté behind with security, (Doc. No. 28 at 2), but in doing so, Plaintiff made a scene. He shoved a box containing jars of the pâté off his suitcase; the box hit the table the suitcase was on and then slid over the edge onto the floor. (TSA Video, PTZB2 B Sterile and B15 B3 Bag Search at 9:11:37–9:11:38 a.m.). Then Plaintiff quickly zipped his suit case and rushed off. (Id. at 9:11:38–9:11:45 a.m.).

Plaintiff and his girlfriend hurried away from the security checkpoint and toward the food court. (Doc. No. 28-5 at 77; TSA Video, PTZB2 B Sterile at 9:11:47–9:11:56 a.m.). No TSA employees or law enforcement officers immediately stopped or even attempted to stop Plaintiff as he left the security checkpoint. (TSA Video at 9:11:50–9:11:56 a.m.). Plaintiff did not go far before he turned around and had a verbal exchange with some of the TSA employees and law enforcement officers, whom he told to "feast on" the pâté. (Doc. No. 28-5 at 74, 77; TSA Video, B24 East Exit Area at 9:12:04–9:12:07 a.m.). Plaintiff and his girlfriend allege that Defendant Copeland provoked this exchange with a derogatory comment based on Plaintiff's French ethnicity

as Plaintiff left the security checkpoint. (Doc. Nos. 28-5 at 74–76; 31 at 115). As Plaintiff re-approached the security checkpoint, one of the TSA managers pointed to Plaintiff and then pointed back to the security checkpoint. (TSA Video, B24 East Exit Area at 9:12:06–9:12:08 a.m.). Immediately after this exchange, two officers, including Defendant Copeland, followed and approached Plaintiff and his girlfriend, at which point all parties appear to engage in conversation. (Id. at 9:12:07–9:12:15 a.m.). Officer Ely also followed Plaintiff, but had a conversation with some of the TSA employees before joining the conversation between Defendant Copeland, Officer Williams, Plaintiff, and his then-girlfriend shortly thereafter. (Id. at 9:12:15–9:12:37 a.m.).

Both Plaintiff and Defendant Copeland focus their narratives on the subsequent interaction between the two of them. Yet, the TSA Video shows an interaction between Officer Williams and Plaintiff prior to Plaintiff's arrest. Specifically, during this second interaction with the three law enforcement officers, Officer Williams was the primary person speaking with Plaintiff and his then-girlfriend while Officer Ely and Defendant Copeland stood behind them. (Id. at 9:12:22–9:13:52 a.m.). Officer Williams repeatedly pointed back to the security checkpoint. Defendant did not step into the conversation until after Officer Williams had spoken to Plaintiff for approximately a minute and a half. (Id. at 9:13:52 a.m.). Almost immediately thereafter, Defendant Copeland arrested Plaintiff. (Id. at 9:14:22–9:15:00 a.m.).

According to both Plaintiff and Defendant Copeland, Defendant Copeland told Plaintiff that he must leave the airport. (Doc. Nos. 28-4 at 105–06; 28-5 at 77). When Plaintiff said that he was not going to leave, Defendant Copeland told Plaintiff that he could either leave voluntarily or he would be arrested and removed from the airport. (Doc. Nos. 28-4 at 105–06; 28-5 at 77–78). Plaintiff directed Defendant Copeland to arrest him: "All right, fine, take me – put me in jail… So, I said put me in jail," (Doc. No. 28-5 at 10); "I'm not walking out this door because I didn't do

anything wrong, so you're going to have to arrest me if you want me to leave." (Doc. No. 31 at 119). At that point, with no apparent physical resistance from Plaintiff, Defendant Copeland arrested Plaintiff. (TSA Video, B24 East Exit Area at 9:14:22–9:15:00 a.m.).

After Plaintiff's arrest, a state Magistrate Judge initially found that there was probable cause for the arrest but later "unfound" probable cause. (Doc. No. 30 at 14). Additionally, the Mecklenburg County District Court eventually dismissed all charges against Plaintiff.

On July 20, 2015, Plaintiff filed the instant action against Defendant Copeland, Defendant Scott C. Gerson, Police Chief Kerr Putney, and the City of Charlotte. Each of Plaintiff's claims derive from his contention that Defendant Copeland unlawfully arrested him without probable cause. Plaintiff specifically contends that the arrest was unlawful and that he is entitled to relief pursuant to the following claims: (1) 42 U.S.C. § 1983 due to violation of his Fourth and Fourteenth Amendment rights; (2) assault and battery; (3) false arrest and illegal imprisonment; (4) malicious prosecution; (5) intentional infliction of emotional distress ("IIED"); (6) negligent infliction of emotional distress ("NIED"); and (7) punitive damages. Plaintiff has dismissed his claims against Defendant Gerson entirely and has also dismissed his pattern-and-practice and failure to supervise Monell claims against Defendants Putney and the City of Charlotte, (Doc. No. 25), leaving only Plaintiff's claims against Defendant Copeland and Plaintiff's vicarious liability claims against Defendants Putney and the City of Charlotte.

Now, Plaintiff, in his summary judgment motion, argues for summary judgment on the § 1983, assault and battery, and false arrest and illegal imprisonment claims. (Doc. Nos. 27 and 28). Defendant, on the other hand, seeks summary judgment in his favor on all counts. (Doc. Nos. 29 and 30).

## II. STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine dispute as to any material fact, and it appears that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2); United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991). Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986). The party moving for summary judgment bears the burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

If this initial burden is met, the opposing party may not rest on the mere allegations in the complaint. Id. at 247–48. Rather, the opposing party "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita, 475 U.S. at 587. Where, however, the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, summary judgment is appropriate. Anderson, 477 U.S. at 248–49.

The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. Id. "If the evidence is merely colorable or is not significantly probative," summary judgment is appropriate. Id. at 249–50 (citations omitted). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt [the moving party's] version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

## III. DISCUSSION

The cross motions for summary judgment come down to two issues: (1) whether there was probable cause for Defendant to arrest Plaintiff, and (2) whether the claims against Defendant should be barred by qualified immunity. Because all of Plaintiff's claims stem from his arrest by Defendant, resolving either of these questions in the affirmative eliminates Plaintiff's claims against Defendants.

### a. Whether Probable Cause to Arrest Plaintiff Existed

The Federal Civil Rights Act, 42 U.S.C. § 1983, imposes civil liability upon every person who, under color of law, deprives another of rights secured by the Constitution and laws of the United States. 42 U.S.C. § 1983. An arrest made in violation of a person's Fourth Amendment right to be free from unreasonable seizures, therefore, will give rise to a claim under 42 U.S.C. § 1983. See, e.g., Street v. Surdyka, 492 F.2d 368 (4th Cir. 1974). The validity of a warrantless arrest under fourth amendment principles, as well as the validity of such an arrest under state-law standards, hinges upon the existence of probable cause. Surdyka, 492 F.2d 368; Myrick v. Cooley, 371 S.E.2d 492, 494 (N.C. Ct. App. 1988); see also N.C. Gen. Stat. § 15A-401(b)(1) ("An officer may arrest without a warrant any person who the officer has probable cause to believe has committed a criminal offense . . . in the officer's presence."); Melton v. Dermota, 940 F.2d 652 (4th Cir. 1991) ("[T]here is no cause of action for 'false arrest' under section 1983 unless the arresting officer lacked probable cause.").

"'Probable cause,' for Fourth Amendment purposes, means 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir. 1992) (quoting

Michigan v. De Fillippo, 443 U.S. 31, 37 (1979)). In other words, the question is not merely whether probable cause existed but rather whether a reasonable officer in the same situation would have believed he had probable cause to arrest. This test is the same for both § 1983 and state law claims. See Myrick, 371 S.E.2d at 495. Moreover, officers can lawfully arrest a person so long as they have probable cause to arrest him for any offense. Devenpeck v. Alford, 543 U.S. 146, 153–55 (2004). Put simply, if an officer had probable cause to believe that a person had committed any crime in his presence, then no civil liability claim will exist under federal or state law.

Determining whether an officer had probable cause to arrest a person requires the examination of the specific violations for which the person was arrested. Plaintiff was arrested for violations of N.C. Gen. Stat. § 14-223 ("Resisting Officers") and N.C. Gen. Stat. § 14-275.1 ("Disorderly Conduct at Airport"). N.C. Gen. Stat. § 14-223 provides:

> If any person shall willfully and unlawfully resist, delay or obstruct a public officer in discharging or attempting to discharge a duty of his office, he shall be guilty of a Class 2 misdemeanor.

N.C. Gen. Stat. § 14-275.1 provides:

> Any person shall be guilty of a Class 3 misdemeanor, if such person while at, or upon the premises of . . . [a]ny airport or air terminal used by any common carrier, or [a]ny airport or air terminal owned or leased, in whole or in part, by any county, municipality or other political subdivision of the State, or privately owned airport shall (1) [e]ngage in disorderly conduct, or (2) [u]se vulgar, obscene or profane language, or (3) [o]n any one occasion, without having necessary business there, loiter and loaf upon the premises after being requested to leave by any peace officer or by any person lawfully in charge of such premises.

Thus, the question at hand is whether a reasonable police officer could conclude that there was probable cause to believe that Plaintiff either unlawfully resisted, delayed, or obstructed a public officer, or that Plaintiff engaged in disorderly conduct at the airport or otherwise violated N.C. Gen. Stat. § 14-275.1.

Although some facts in the instant matter are contested—namely, what was said by either Plaintiff or Defendant Copeland during their interaction leading up to the arrest—the undisputed material facts, including the TSA video, sufficiently demonstrate that a reasonable officer could have concluded that probable cause existed to believe that Plaintiff had violated or was going to violate both N.C. Gen. Stat. § 14-223 and N.C. Gen. Stat. § 14-275.1.  In other words, any factual disputes do not affect, nor would any resolution of those disputes affect, a determination of whether a reasonable officer could have believed that he had probable cause to arrest Plaintiff.

Defendant Copeland was called to the scene to defuse an encounter between Plaintiff and TSA.  The video shows that Defendant remained calm throughout the interaction with Plaintiff.  Plaintiff, on the other hand, at minimum was interacting with TSA and law enforcement in an animated fashion accurately described as confrontational.  Among other things, Plaintiff dunked his fingers in a jar of the suspect pâté while pleading his case and concluded the interaction with TSA by shoving a box of jars containing the pâté off of his suitcase causing it to hit the table and fall to the floor.  Throughout the video, bystanders, including TSA employees, are attracted to the commotion.  Plaintiff did not cause the security checkpoint to stand still and cease operations, but the TSA Video makes clear that Plaintiff created a disruption and a distraction for fellow passengers, and more notably, for several TSA employees and law enforcement officers.

After Plaintiff left the security checkpoint, he continued to cause distraction and disruption to normal airport activities.  Among other things, an individual pushing a cart of boxes was unable to maneuver the cart around Plaintiff and the contingency of law enforcement engaged with Plaintiff, therefore being forced to wait and further block the walkway before continuing the errand. (TSA Video, B24 East Exit Area at 9:13:53–9:14:57 a.m.).  Plaintiff's behavior, and the disruption that it caused, is a sufficient basis to conclude that a reasonable officer could have

concluded that probable cause existed to believe Plaintiff engaged in "disorderly conduct" in violation of N.C. Gen. Stat. § 14-275.1.

Additionally, Plaintiff's refusal to heed the warnings and instructions of law enforcement officers after leaving the security checkpoint provided a sufficient basis for an officer to reasonably conclude that probable cause for Plaintiff's arrest for violations of N.C. Gen. Stat. § 14-223 and N.C. Gen. Stat. § 14-275.1 existed. Plaintiff and his girlfriend, unheeded, left the security screening area. Defendant Copeland and other law enforcement and TSA employees soon followed them. There is sworn, uncontradicted evidence that a TSA manager told Defendant Copeland that Plaintiff had not cleared security. (Doc. No. 28-4 at 32, 96). Consistent with that testimony, Defendant Copeland's official narrative of the event noted that Plaintiff "had not yet finished his screening with TSA." (Doc. No. 30 at 6). Indeed, the TSA Video shows Officer Williams, Defendant Copeland, and a TSA manager gesturing back to the security checkpoint. Defendant Copeland warned Plaintiff that he would arrest him if Plaintiff did not leave the airport. Not only did Plaintiff not cooperate, he instructed Defendant Copeland to arrest him. A reasonable jury could not conclude that no reasonable officer could have determined that probable cause existed to arrest Plaintiff. See, e.g., Sowers, 2016 WL 4735149, *2 (4th Cir. Sept. 12, 2016) (holding that summary judgment against Plaintiff was proper where Plaintiff "refused to follow directions" from officers and noting that "[t]he officers warned [Plaintiff] they would arrest him if he did not listen to the officers, but he refused to cooperate."); Kagan v. Moseley, 2008 WL 361014, *1 (E.D.N.C. Feb. 11, 2008) (holding that Defendant Officer was protected by qualified immunity where Plaintiff was arrested for a violation of N.C. Gen. Stat. § 14-275.1 in part for not complying with officer's request to leave a bus station).

In short, the facts and circumstances within Defendant Copeland's knowledge were sufficient for a reasonable officer to conclude that there was probable cause to arrest Plaintiff for violations of N.C. Gen. Stat. § 14-223 and N.C. Gen. Stat. § 14-275.1. The bases for a reasonable officer to find probable cause, even assuming facts in a light most favorable to Plaintiff, include: Defendant Copeland was called onto the scene to deal with a "disruptive passenger"; Plaintiff was very animated to the point of being confrontational; Plaintiff was occupying the attention of no less than six TSA and law enforcement officials; Plaintiff shoved a box of the suspect jars to the floor; Plaintiff demonstrably closed his luggage; Plaintiff quickly and abruptly left the security checkpoint; Plaintiff returned and told TSA and law enforcement officials to "feast on" the pâté; Defendant Copeland was told by TSA that Plaintiff had not cleared security; Plaintiff refused the request from law enforcement officials for him to leave the airport; and Plaintiff told Defendant Copeland to arrest him. No reasonable jury could determine that a reasonable officer with the same information as Defendant Copeland could not conclude that probable cause exited.

### b. Whether Defendant Copeland Is Entitled to the Protection of Qualified Immunity

The doctrine of qualified immunity "protect[s] government officials performing discretionary functions from civil damage suits 'insofar as [the officials'] conduct does not violate clearly established rights of which a reasonable person would have known.'" Porterfield v. Loft, 156 F.3d 563, 567 (4th Cir. 1998) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In determining whether qualified immunity applies, courts look at two questions: (1) whether violation of a constitutional right has been alleged, and (2) whether the right was "clearly established" at the time of the alleged violation such that a reasonable officer would have understood that what he was doing violated that clearly established right. Anderson v. Creighton, 483 U.S. 635, 640 (1987). The Court is not bound to resolve either of these two questions first.

Pearson v. Callahan, 555 U.S. 223, 236 (2009); see also Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012). A defendant will be entitled to the protection of qualified immunity if the answer to either of the two questions posed above is "no." Reichle, 132 S. Ct. at 2093.

Moreover, qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). So long as an officer does not violate a clearly proscribed law, he is entitled to qualified immunity. Mitchell v. Forsyth, 472 U.S. 511, 528 (1985); see also Ashcroft v. al-Kidd, 563 U.S. 731 (2011) (an officer is entitled to qualified immunity unless "'every reasonable official would have understood that what he [was] doing'" violated the Constitution). Indeed, "officers are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992).

"[T]he legal question of a defendant's entitlement to qualified immunity under a particular set of facts should be decided by the court, not by a jury." Willingham v. Crooke, 412 F.3d 553, 560 (4th Cir. 2005). Further, "because qualified immunity is designed to shield officers not only from liability but from the burdens of litigation, its establishment at the pleading or summary judgment stage has been specifically encouraged." Pritchett v. Alford, 973 F.2d 307, 313 (4th Cir. 1992) (citing Harlow, 457 U.S. at 815–19; Mitchell, 472 U.S. at 526). But, where a factual dispute exists, "the district court should submit factual questions to the jury and reserve for itself the legal question of whether the defendant is entitled to qualified immunity on the facts found by the jury." Id.

In the context of alleged Fourth Amendment violations, as is the case here, the qualified immunity analysis closely resembles the probable cause analysis in part because both rely on an objective reasonableness standard. Nonetheless, the standards are different and the distinction

hinges primarily on the level of specificity with which the relevant legal right that is at issue is defined for purposes of the "clearly established" analysis. Creighton, 483 U.S. at 639. The legal right cannot be so broadly and generally defined so as to eliminate the touchstone of "objective legal reasonableness" and effectively eliminate qualified immunity in § 1983 cases. Id. Thus, the "clearly established" component of the qualified immunity analysis cannot be defined generally as the right to be free from arrest absent probable cause, but rather, the right must be more narrowly defined—"[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 640.

Here, the Court finds that the constitutional right implicated by Plaintiff's arrest was the Fourth Amendment right to be free from unreasonable search and seizure.[3] Specifically, that constitutional right is implicated in this case in the form of the right not to be arrested except upon probable cause to believe that Plaintiff had violated either N.C. Gen. Stat. § 14-223 or § 14-275.1. Having identified the specific constitutional right allegedly violated, the Court chooses to exercise its discretion and begin its analysis with the second prong—whether the right was "clearly established." In order for a right to be clearly established, it must "be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001). In other words, the application of qualified immunity is appropriate "if a reasonable officer possessing the same information could have believed that his conduct was lawful." Slattery v. Rizzo, 939 F.2d 213, 216 (4th Cir. 1991) (emphasis in original). An officer's subjective intent or

---

[3] Plaintiff also alleges that his Fourteenth Amendment substantive due process rights were violated by his arrest. Defendant Copeland correctly asserts that an allegation of an arrest without probable cause in violation of the Fourteenth Amendment does not state a claim under 42 U.S.C. § 1983. Albright v. Oliver, 510 U.S. 266, 274 (1994) (holding that the Fourteenth Amendment and substantive due process afforded Plaintiff no relief in a § 1983 alleging an arrest without probable cause, noting "[t]he Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it.").

state of mind is not relevant to the qualified immunity analysis. Park v. Shiflett, 250 F.3d 843, 853 (4th Cir. 2001).

As stated above, a reasonable officer could have concluded that probable cause existed to arrest Plaintiff for violations of N.C. Gen. Stat. § 14-223 and N.C. Gen. Stat. § 14-275.1. On that basis alone, Defendant Copeland is entitled to qualified immunity. At the broadest level, the right alleged to be violated here could be identified as the right to be free from arrest absent probable cause. Even with that level of generality, which the Supreme Court has instructed should not be used, a reasonable officer could have concluded probable cause existed for Plaintiff's arrest. Narrowing the definition of the right only benefits the officer by making it less likely that the right was clearly established. For example, in the context of N.C. Gen. Stat. § 14-275.1, the Court is only aware of one case—an unpublished decision—addressing a violation of the statute. See Kagan v. Moseley, 2008 WL 361014, *1. And in that case, Plaintiff was arrested for refusing to leave a bus station after a police officer instructed him to do so. The district court dismissed the case on summary judgment because it found that the defendant officer had probable cause and acted reasonably within the scope of his duties. Id. at 4. Furthermore, although Defendant Copeland testified to receiving training, he did not testify, nor is there any indication, that he was trained that behavior similar to Plaintiff's would not constitute a disturbance for purposes of an arrest. (Doc. No. 28-4 at 8). Although there need not be a decision holding the exact same conduct unlawful, pre-existing law must make the unlawfulness of an officer's conduct apparent. Creighton, 483 U.S. at 640.

Moreover, the precedent on qualified immunity in § 1983 cases gives officers significant deference. See, e.g., Porterfield, 156 F.3d at 567–68. Nothing Defendant Copeland did was "plainly incompetent" nor did it violate a clearly proscribed law. Further, it cannot be said about

Defendant Copeland's actions that "every reasonable official would have understood that what he [was] doing" violated the Constitution. Indeed, Defendant Copeland was surrounded by other law enforcement and TSA officials throughout the process, and for most of the interaction with Plaintiff, Defendant Copeland was not the individual directly interacting with him. Despite the presence of other law enforcement and TSA officials, there is no indication nor any allegation that any of them attempted to prevent or discouraged Defendant Copeland from arresting Plaintiff.

Based on the reaction and behavior of Defendant Copeland's fellow officers and the TSA agents and the lack of precedent for such an instance as encountered by Defendant Copeland; and given that the limited precedent supports Defendant Copeland's actions here, the Court cannot say that Defendant Copeland violated a clearly established right such that a reasonable officer would believe his conduct was unlawful.

In response to both Defendant Copeland's qualified immunity and probable cause arguments, Plaintiff takes Defendant to task for various "inconsistencies" in his narrative for the arrest warrant and his deposition when compared to the TSA footage. Plaintiff also points to confrontational and derogatory comments alleged made by Defendant Copeland as grounds for an improper motive behind the arrest. But these arguments miss the point. First, the subjective intent of Defendant Copeland is entirely irrelevant. See Park, 250 F.3d at 853. The analysis at hand involves objective reasonableness. Second, any misstatements made by Defendant Copeland, whether intentional or otherwise, have no effect on the undisputed facts presented, particularly the TSA Video. Whether Plaintiff threw or shoved a box of the pâté jars or whether Plaintiff was literally running or not can be discerned from the TSA Video and therefore are not material disputes of fact, nor do they affect the objective reasonableness analysis for probable cause or qualified immunity.

### c. Derivate and State Law Claims

Plaintiff also alleges various state law violations, but Defendant Copeland cannot be held liable for any of the state law claims in Plaintiff's complaint based upon the findings above. (Doc. No. 1, Counts 2–7). If an officer is entitled to qualified immunity on the §1983 claim, then he is entitled to public official immunity on the state law claims as well. Cooper v. Sheehan, 735 F.3d 153, 158 (4th Cir. 2013) ("[T]he analysis of public officers' immunity is functionally identical to our discussion of the Officers' entitlement to qualified immunity with respect to the §1983 claims."). It is the plaintiff's burden to overcome a defendant's presumptive entitlement to both qualified immunity and public official immunity. Davis v. Scherer, 468 U.S. 183, 197 (1984) ("A plaintiff who seeks damages for violation of constitutional or statutory rights may overcome the defendant official's qualified immunity only by showing that those rights were clearly established at the time of the conduct at issue."); Jones v. Kearns, 462 S.E.2d 245, 248 (N.C. Ct. App. 1995) ("Allegations of 'reckless indifference' are not sufficient to satisfy [a] plaintiff's burden to allege and forecast evidence of corruption or malice."). Therefore, Defendant Copeland is also protected from the state law claims against him by public official immunity.

Finally, Plaintiff alleges that Defendants Putney and City of Charlotte also should be held vicariously liable for the conduct of Defendant Copeland. Each of the remaining claims is dependent upon an underlying violation by Defendant Copeland. Having determined that the claims against Defendant Copeland should be dismissed on probable cause and qualified immunity grounds, the Court also dismisses all claims against the City of Charlotte and Defendant Putney. There is no underlying liability for which the City of Charlotte and Defendant Putney can be held accountable on a derivative basis. See Turner v. City of Greenville, 677 S.E.2d 480, 484 (N.C. Ct.

App. 2009); Prior v. Pruett, 550 S.E.2d 166, 172–73 (N.C. Ct. App. 2001), disc. review denied, 563 S.E.2d 572 (2002).

This is not a case involving Plaintiff's subjective experience of frustration and exasperation at the TSA checkpoint. Perhaps TSA has better things to do than concern itself with truffle pâté. It is rather a case concerning the reasonableness of Defendant Copeland's actions. And with this properly focused issue, Plaintiff has no case.

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. Plaintiff's Motion for Summary Judgment, (Doc. No. 27), is **DENIED**;
2. Defendant's Motion for Summary Judgment, (Doc. No. 29), is **GRANTED**;
3. Plaintiff's Complaint, (Doc. No. 1), is **DISMISSED with prejudice**; and
4. The Clerk of Court is directed to close this case.

Signed: October 13, 2016

_____
Robert J. Conrad, Jr.
United States District Judge